**2016-2266**

# United States Court of Appeals for the Federal Circuit

NINTENDO OF AMERICA INC.
and NINTENDO CO., LTD.,

*Appellants,*

v.

ILIFE TECHNOLOGIES, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board in Case No. IPR2015-00109*

# APPELLEE'S RESPONSIVE BRIEF

Michael C. Wilson
Daniel E. Venglarik
S. Wallace Dunwoody
Munck Wilson Mandala, LLP
12770 Coit Road, Suite 600
Dallas, TX 75251
(972) 628-3600
*Counsel for Appellee*

December 30, 2016

# US 6,864,796
# Challenged Claims

**1.** A system within a communications device capable of evaluating movement of a body relative to an environment, said system comprising:

> a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and

> a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance

> wherein said processor generates tolerance indicia in response to said determination; and

> wherein said communication device transmits said tolerance indicia.

**2.** The system as claimed in claim 1 wherein said communications device comprises one of: a cordless telephone, a cellular telephone and a personal digital assistant.

**3.** The system as claimed in claim 1 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

**9.** The system as claimed in claim 1 wherein said communications device transmits said tolerance indicia to a monitoring controller.

**10.** A method for operating a system within a communications device, wherein said system is capable of evaluating movement of a body relative to an environment, wherein said system comprises a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and

a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance, wherein said method comprises the steps of:

generating tolerance indicia in said processor in response to said determination of whether said evaluated body movement is within said environmental tolerance; and

transmitting said tolerance indicia through said communications device.

**11.** The method as claimed in claim 10 wherein said communications device comprises one of: a cordless telephone, a cellular telephone and a personal digital assistant.

**12.** The method as claimed in claim 10 wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device.

**18.** The method as claimed in claim 10 further comprising the step of:

transmitting said tolerance indicia from said communications device to a monitoring controller.

**19.** The method as claimed in clam 10 further comprising the steps of:

generating in said processor state indicia while processing said sensed accelerative phenomena, which represents a state of said body within said environment over time; and

transmitting said state indicia through said communications device.

**20.** The method as claimed in claim 10 further comprising the steps of:

generating in said processor an output signal that is indicative of measurements of both static and dynamic acceleration of said body in plural axes; and

transmitting said output signal through said communications device.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

Nintendo of America Inc.     **v.**     iLife Technologies, Inc.

Case No. 2016-2266

## CERTIFICATE OF INTEREST

Counsel for the: ☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

iLife Technologies, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held Companies that own 10 % or more of stock in the party |
|---|---|---|
| iLife Technologies, Inc. | n/a | iLife Solutions, Inc. |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Munck Wilson Mandala, LLP: Michael C. Wilson, Daniel E. Venglarik, and S. Wallace Dunwoody.

| December 30, 2016 | /s/ Daniel E. Venglarik |
|---|---|
| Date | Signature of counsel |
| Please Note: All questions must be answered | Daniel E. Venglarik |
| | Printed name of counsel |

cc:

iv

# Table of Contents

**Page**

Challenged Claims...................................................................................i

Certificate of Interest .........................................................................iv

Table of Contents................................................................................ v

Table of Authorities.........................................................................viii

Statement of Related Cases ..............................................................xiii

Statement of Issues ............................................................................ 1

I.    Introduction ............................................................................... 2

II.   Statement of the Case and Facts.................................................. 5

      A.    The '796 patent is directed to "a system within a
            communications device" and claims priority to the '991
            application filed September 15, 1999. .................................... 5

      B.    The '796 patent and the '991 application describe
            various exemplary embodiments, including *one-way*
            and *distributed* communications devices. ............................. 5

      C.    In the IPR, Nintendo relied on a single reference,
            *Yasushi*, and did not offer constructions for
            "communications device" or "within a communications
            device.".......................................................................... 13

      D.    iLife presented evidence antedating *Yasushi* based on
            prior reduction to practice of embodiments using one-
            way and distributed communications devices. ..................... 14

      E.    The PTAB determined the broadest reasonable
            construction of communication device. ............................... 15

      F.    The PTAB found that the challenged claims are
            entitled to the '991 application's priority date of
            September 15, 1999............................................................ 16

G.    The PTAB found actual reduction to practice of the claimed invention before November 10, 1998. ...................... 17

H.    The PTAB determined that Nintendo failed to prove invalidity over *Yasushi*. ......................................................... 19

III.    Summary of Argument ................................................................... 20

IV.    Arguments and Authorities ........................................................... 22

A.    The PTAB correctly rejected Nintendo's narrow construction of the term "communications device." .............. 22

1.    Nintendo waived error regarding the terms "communications device" and "within a communications device." ............................................... 22

2.    The PTAB correctly construed "communications device" consistent with iLife's proposed construction. ................................................................ 23

3.    The '796 patent defines "communications device" broadly and without limitation. ................................... 25

4.    The broadest reasonable interpretation includes devices with a one-way RF transmitter. ...................... 26

5.    The broadest reasonable interpretation includes distributed devices with wirelessly associated components. ............................................................... 29

6.    Nintendo's other claim construction arguments lack merit. ................................................................... 34

B.    The PTAB correctly found that the challenged claims are supported by the written description of the '991 application. ........................................................................... 36

1.    Priority under section 120 turns on findings of fact that are reviewed for substantial evidence. ......... 36

2.    The PTAB correctly analyzed section 120 priority by evaluating whether written description in the

'991 application supports the claims of the '796 patent..........................................................................39

3.  Nintendo incorrectly analyzes section 120 priority.......................................................................44

C.  The PTAB correctly found that the evidence shows actual reduction to practice prior to *Yasushi*.......................55

1.  The Court may affirm the PTAB's decision because Nintendo waived arguments concerning the invention date. .......................................................55

2.  The PTAB's conclusions of law are reviewed de novo, while its findings of fact are reviewed for substantial evidence. ...................................................56

3.  An invention date is established by showing reduction to practice of a single working embodiment of the invention.......................................57

4.  The PTAB's findings and conclusions are supported by substantial evidence..............................60

D.  The Court should reject Nintendo's collateral estoppel arguments..................................................................64

1.  iLife is not estopped from arguing that the '796 patent claims are patentable over Yasushi. ................64

2.  iLife did not waive or acquiesce to an issue first raised by Nintendo only when iLife had no further right to respond.............................................66

V.  Conclusion.......................................................................67

Certificate of Service and Filing ............................................68

Certificate of Compliance ....................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Application of Angstadt,*
　537 F.2d 498 (C.C.P.A. 1976) ................................................... 38, 43, 62

*Application of Risse,*
　378 F.2d 948 (C.C.P.A. 1967) ............................................................. 43

*Augustine Medical, Inc. v. Gaymar Indus., Inc.,*
　181 F.3d 1291 (Fed. Cir. 1999) ............................................... 39, 47, 52

*In re Bond,*
　910 F.2d 831 (Fed. Cir. 1990) ........................................................... 23

*Bradford Co. v. Conteyor N. Am., Inc.,*
　603 F.3d 1262 (Fed. Cir. 2010) ......................................................... 32

*Capon v. Eshhar,*
　418 F.3d 1349 (Fed. Cir. 2005) ......................................................... 38

*CCS Fitness, Inc. v. Brunswick Corp.,*
　288 F.3d 1359 (Fed. Cir. 2002) ......................................................... 24

*Consol. Edison Co. v. NLRB,*
　305 U.S. 197 (1938) .......................................................................... 57

*Cuozzo Speed Techs., LLC v. Lee,*
　136 S. Ct. 2131 (2016) ...................................................................... 23

*Dealertrack, Inc. v. Huber,*
　674 F.3d 1315 (Fed. Cir. 2012) ..................................................... 25, 28

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.,*
　672 F.3d 1270 (Fed. Cir. 2012) ......................................................... 20

*Estee Lauder Inc. v. L'Oreal, S.A.,*
　129 F.3d 588 (Fed. Cir. 1997) ........................................................... 57

*In re Freeman,*
   30 F.3d 1459 (Fed. Cir. 1994) ...................................................... 65, 66

*Gillette Co. v. Energizer Holdings Inc.,*
   405 F.3d 1367 (Fed. Cir. 2005) ................................................... 29, 54

*Go Med. Indus. Pty., Ltd. v. Inmed Corp.,*
   471 F.3d 1264 (Fed. Cir. 2006) ......................................................... 52

*Henkel Corp. v. Proctor & Gamble Co.,*
   560 F.3d 1286 (Fed. Cir. 2009) ................................................... 56, 57

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
   78 F.3d 1575 (Fed. Cir. 1996) .......................................................... 27

*Inphi Corp. v. Netlist, Inc.,*
   805 F.3d 1350 (Fed. Cir. 2015) ......................................................... 36

*Interconnect Planning Corp. v. Feil,*
   774 F.2d 1132 (Fed. Cir. 1985) ......................................................... 65

*In re Jolley,*
   308 F.3d 1317 (Fed. Cir. 2002) ................................................... 37, 44

*Joovy LLC v. Target Corp.,*
   437 F. App'x 932 (Fed. Cir. 2011) ................................................ 25, 28

*Liebel–Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004) .......................................................... 33

*Lucent Technologies, Inc. v. Gateway, Inc.,*
   543 F.3d 710 (Fed. Cir. 2008) .......................................................... 52

*Mahurkar v. C.R. Bard, Inc.,*
   79 F.3d 1572 (Fed. Cir. 1996) .......................................................... 56

*Mars Inc. v. H.J. Heinz Co.,*
   377 F.3d 1369 (Fed. Cir. 2004) ................................................... 29, 54

*Martin v. Johnson,*
   454 F.2d 746 (C.C.P.A. 1972) ........................................................... 37

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
   812 F.3d 1284 (Fed. Cir. 2015) .................................................. 22, 55

*Moba, B.V. v. Diamond Automation, Inc.*,
   325 F.3d 1306 (Fed. Cir. 2003) ......................................... 36

*Molins PLC v. Textron, Inc.*,
   48 F.3d 1172 (Fed. Cir. 1995) .......................................... 58

*Monsanto Co. v. Syngenta Seeds, Inc.*,
   503 F.3d 1352 (Fed. Cir. 2007) ........................................ 52

*In re Owens*,
   710 F.3d 1362 (Fed. Cir. 2013) ................................... 36, 37

*In re Paulsen*,
   30 F.3d 1475 (Fed. Cir. 1994) ..................................... 24, 25

*Pfaff v. Wells Elecs., Inc.*,
   525 U.S. 55 (1998) .......................................................... 57

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................... 28, 35

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ............................... *passim*

*Price v. Symsek*,
   988 F.2d 1187 (Fed. Cir. 1993) ........................................ 57

*Redline Detection, LLC v. Star Envirotech, Inc.*,
   811 F.3d 435 (Fed. Cir. 2015) ......................... 22, 23, 55, 56

*Research Corp. Techs, Inc. v. Microsoft Corp.*,
   627 F.3d 859 (Fed. Cir. 2010) ......................................... 50

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
   326 F.3d 1255 (Fed. Cir. 2003) ........................................ 64

*Santarus, Inc. v. Par Pharma., Inc.*,
   694 F.3d 1344 (Fed. Cir. 2012) ............................... 39, 45, 52

*SAS Inst., Inc. v. ComplementSoft, LLC,*
    825 F.3d 1341 (Fed. Cir. 2016) ........................................................ 24

*In re Spiller,*
    500 F.2d 1170 (C.C.P.A. 1974) .................................................. 59, 62

*In re Stryker,*
    435 F.2d 1340 (C.C.P.A. 1971) .................................................. 59, 63

*Union Oil Co. of Cal. v. Atl. Richfield Co.,*
    208 F.3d 989 (Fed. Cir. 2000) .............................................. 38, 42, 44

*Utter v. Hiraga,*
    845 F.2d 993 (Fed. Cir. 1988) .............................................. 38, 43, 53

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................ 30

*In re Vogel,*
    422 F.2d 438 (C.C.P.A. 1970) ........................................................ 34

*Waldemar Link v. Osteonics Corp.,*
    32 F.3d 556 (Fed. Cir. 1994) .................................................. 39, 45

*Wang Labs. v. Toshiba Corp.,*
    993 F.2d 858 (Fed. Cir. 1993) .................................................. 37, 38

*Woods v. DeAngelo Marine Exhaust, Inc.,*
    692 F.3d 1272 (Fed. Cir. 2012) ........................................................ 43

**Statutes**

37 C.F.R. § 42.100 ........................................................................ 23

37 C.F.R. § 42.104 ........................................................................ 22

35 U.S.C. 102 .......................................................... 13, 55, 58

35 U.S.C. § 103 .............................................................................. 2

35 U.S.C. § 112 ............................................................... *passim*

35 U.S.C. § 120................................................................................... *passim*

35 U.S.C. § 312(a)(3) ..................................................................... 22

## Other Authorities

FED. R. APP. P. 32 ............................................................................ 68

M.P.E.P. § 715 (9th ed. 2015)................................................. 58

M.P.E.P. § 715.02 (9th ed. 2015)................................... 58, 63

M.P.E.P. § 2152.01 (9th ed. 2015)............................... 52

## Statement of Related Cases

iLife generally agrees with Nintendo's statement of related cases but clarifies the following:

1.  Nintendo of America Inc. ("NOA") is the sole defendant in the action styled *iLife Technologies, Inc. v. Nintendo of America Inc.*, No. 3:13-cv-04987 (N.D. Tex.). NOA is a wholly-owned subsidiary of Nintendo Co. Ltd. ("NCL"), but NCL is not a named party to the suit.

2.  iLife has filed nine actions to enforce the '796 patent, but only the *Nintendo* litigation remains pending. The following cases have been settled and dismissed: *iLife v. OnAsset*, 3:12-cv-05155 (N.D. Tex.); *iLife v. Lifeline*, 3:12-cv 05157 (N.D. Tex.); *iLife v ActiveCare*, 3:12-cv-05161 (N.D. Tex.); *iLife v. Pioneer*, 3:12-cv-05162 (N.D. Tex.); *iLife v. Body Media,* 2:14-cv-00990 (W.D. Pa.); *iLife v. AliphCom*, 3:14-cv-03345 (N.D. Cal.); *iLife v. Fitbit*, 3:14-cv-03338 (N.D. Cal.); *iLife v. Under Armour*, 3:13-cv-04781 (N.D. Tex.).

3.  In the district court litigation, iLife asserts that the Nintendo Wii and Wii U systems and associated games infringe claims of the '796 patent. iLife has not accused other Nintendo video game products.

## Statement of Issues

iLife disagrees with Nintendo's statement of the issues. The proper issues on appeal are as follows:

1. Did the PTAB properly determine that the broadest reasonable interpretation of the term "communications device" includes *one-way* communications devices, such as exemplary system 11 disclosed in the '796 patent?

2. Did the PTAB properly determine that the broadest reasonable interpretation of the term "communications device" includes *distributed* devices, such as wirelessly associated devices disclosed in the specification and recited in claims 2 and 11 of the '796 patent (like a cordless telephone)?

3. Did Nintendo waive error by failing to timely propose constructions of the term "communications device" and "within a communications device"?

4. Does substantial evidence support the PTAB's conclusion that the original '991 application provides written description support for claims in the '796 patent reciting a system within a communications device?

5. Does substantial evidence support the PTAB's finding of actual reduction to practice before November 10, 1998, the publication date of *Yasushi*?

## I.    __INTRODUCTION__

In the underlying *inter partes* review, Nintendo asserted that claims 1–3, 9–12, and 18–20 of the '796 patent are invalid under 35 U.S.C. § 103 over JP H10–295649 to *Yasushi* (published Nov. 10, 1998) ("*Yasushi*"). In response, iLife antedated *Yasushi* by presenting uncontroverted evidence of conception and actual reduction to practice before November 10, 1998. The PTAB concluded that *Yasushi* is not prior art.

On appeal, Nintendo contends that the PTAB erred by (1) construing the term "communications device" to include both *one-way* and *distributed* communications devices; (2) finding that the '991 application provides written description support for the challenged claims; and (3) finding that iLife reduced the challenged claims to practice before November 10, 1998.

Nintendo's appeal hinges on two fundamentally flawed positions. First, Nintendo proposes a narrow construction of the term "communications device" that restricts the term's plain meaning, ignores the claim language, and excludes preferred embodiments. The PTAB correctly found that the broadest reasonable interpretation

should include embodiments in the patent using one-way transmitters or distributed communications devices with wirelessly associated components. Nintendo also effectively applies a new claim construction standard for patents issuing from CIP applications by arguing that the PTAB should have based its construction *only* on information added through the CIP. The PTAB properly rejected Nintendo's claim construction positions.

Second, because Nintendo's priority analysis depends on its erroneous construction of "communications device," it also is incorrect. Nintendo compounds this error by analyzing priority based on whether the claims supposedly "encompass new matter," rather than evaluating (as the law requires) whether the original '991 application provides written description support for the properly construed claims. As the PTAB found, the original '991 application describes using the claimed system within communications devices, including (1) a body-worn device using a transmitter; and (2) a "distributed" device comprising a body-worn sensor wirelessly associated with a cell phone. Substantial evidence supports the PTAB's priority analysis and conclusions.

Nintendo repeatedly cites *PowerOasis* as support for its arguments. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008). But Nintendo misconstrues the case. In *PowerOasis*, the Court construed claims *broadly* based *solely* on new matter added through a CIP application. *Id.* at 1309-11. Thus, the CIP's priority date applied. *Id.* at 1311. Here, the opposite is true. The PTAB's construction of "communications device" is fully supported by *the original '991 application*. Because the '991 application supports the claims of the '796 patent, the PTAB's findings on priority were correct.

Finally, Nintendo does not contend that *Yasushi* is 102(a) prior art and does not challenge the accuracy of iLife's evidence showing reduction to practice of the invention before November 10, 1998, the publication date of *Yasushi*. For these reasons, this Court should affirm the PTAB's decision that Nintendo failed to prove claims 1–3, 9–12, and 18–20 of the '796 patent are unpatentable over *Yasushi*.

## II.    STATEMENT OF THE CASE AND FACTS

### A.    The '796 patent is directed to "a system within a communications device" and claims priority to the '991 application filed September 15, 1999.

The '796 patent is titled "Systems Within a Communication Device for Evaluating Movement of a Body and Methods of Operating the Same," and claims priority to application 09/396,991 ("the '991 application"), filed on September 15, 1999. Appx0034. The '796 patent is a continuation of application 09/727,974 (the "CIP application"), filed on November 20, 2000, now US Patent No. 6,501,386. The CIP application was a continuation-in-part of the '991 application, now US Patent 6,307,481. Appx0034. Nintendo provided a highlighted copy of the '796 patent showing additions made through the CIP application. Appx2464-6482. However, as described below, the '796 patent and original '991 application share common disclosure of the claimed system and its incorporation into various communications devices.

### B.    The '796 patent and the '991 application describe various exemplary embodiments, including *one-way* and *distributed* communications devices.

The '796 patent and the '991 application both describe several exemplary embodiments within communications devices. One such embodiment is system 11 shown in Figures 1 and 2:

5



FIG. 1

FIG. 2

In a fall detection embodiment, system 11 is programmed to distinguish between normal and abnormal accelerative events (*e.g.*, walking, sitting, lying down, etc. versus tripping, falling down, etc.), and determine whether an event is acceptable, or within tolerance. Appx0050 at 12:12-17; Appx1274 at 57:3-6. As shown in Figure 4, sensor 25 senses acceleration of the body and outputs signals to a processor 47. Appx0049 at 8:17-45; Appx1263-1264 at 46:19-47:22.



FIG. 4

6

Processor 47 processes sensed acceleration signals and generates an alarm if the body does not rise within a predetermined period following an impact, represented by dynamic acceleration "in excess of about 2 to 4 G[,] depending upon desired sensitivity," accompanied by "a change of body position of 45° or more," represented by a change in static acceleration before and after the impact. Appx0049 at 8:46-9:21; Appx1265-1266 at 48:1-49:14.

Exemplary system 11 includes indicating means 41 that is operable to *communicate* tolerance indicia to a monitoring controller using a one-way RF transmitter:

> Exemplary indicating means 41, in response to direction from processor 47, is operable to accomplish at least one of the following: initiate an alarm event; *communicate* such state, or tolerance, indicia to a monitoring controller; generate statistics; etc. Indicating means 41 may take any number of forms, however, for use in system 11 of the present embodiment, stage 41 is an RF transmitter including RF modulator 61 enabled by processor 47. Exemplary data is presented and modulated at modulator 61, amplified at amplifier 63 and *transmitted* at antenna 65 (to a remote receiver unit as discussed hereinafter).

Appx0048 at 7:1-11; Appx1260-1261 at 43:14-44:1 (emphasis added).

"*Communication* between the processor and the controller may be by a wireless network, a wired network, or some suitable combination of the

same, and may include the Internet." Appx0046 at 3:60-63; Appx1251 at 34:11-13 (emphasis added).

In the example of Figures 1 and 2, system 11 "includes processing circuitry 39, indicating means 41, . . . [and] sensor 25" co-located within "a housing (generally designated 17)." Appx0047 at 6:48-51; Appx1259 at 42:18-21; Appx0047 at 5:25-46; Appx1256-1257 at 39:10-40:5. However, "[s]ystem 11 may be implemented using any suitably arranged computer or other processing system including micro, personal, mini, mainframe or super computers, as well as network combinations of two or more of the same." Appx0048 at 7:24-28; Appx1261 at 44:12-15.

The '796 patent and the '991 application also describe distributed communications devices comprising wirelessly-associated components. "In point of fact, in one advantageous embodiment, sensor 25 and processor 47 are *not co-located*, but rather *associated wirelessly*. To that end, the principles of the present invention may be implemented in any appropriately arranged *device* having processing circuitry." Appx0048 at 7:28-32; Appx1261 at 44:15-19 (emphasis added). In one exemplary "distributed" device, a body worn sensor (system 11 of Figs. 1 and 2) is

wirelessly coupled to a base station (remote receiver unit 103 of Figs. 6 and 7). Appx0049 at 10:25-50; Appx1269-1270 at 52:10-53:8.

Figures 6 and 7 provide "a perspective view of an exemplary remote receiver unit of the system of this invention and a functional block diagram of the same." Appx0049 at 10:25-28; Appx1269 at 52:10-12.



Exemplary remote receiver unit 103 includes an RF receiver 115 tuned "to receive alarm transmissions from sensor 11" and retransmission unit 125 configured to "initiat[e] a call for help or other remote notification." Appx0049 10:40-58; Appx1270 at 53:1-15. Retransmission unit 125 may be "an autodialer, *imbedded digital cellular technology*,

RF transmitter, or the like." Appx0049 10:46-50; Appx1270 at 53:6-8 (emphasis added).

Figure 8 shows "an exemplary hybrid wireless/wired network (generally designated 800) that is associated with a remote monitoring controller 805 according to one embodiment of the present invention." Appx0049 10:65-11:1; Appx1270-1271 at 53:21-54:2.



FIG. 8

"Base stations 801 to 803 are operable to *communicate* with a plurality of mobile stations (MS) 103 (remote receiver unit 103), and 811 to 814." Appx0050 at 11:5-8; Appx1271 at 54:4-6 (emphasis added). In such

embodiments, mobile stations 103 and 811-814 may be "*any suitable cellular devices, including conventional cellular telephones, PCS handset devices, portable computers, metering devices, transceivers, and the like (including, for instance, remote receiver unit 103).*" Appx0049-0050 at 10:65-11:11; Appx1271 at 54:4-10 (emphasis added).

This embodiment assumes that "sensor 25 is associated with the elderly person and that processor 47 is coupled in MS/remote receiver unit 103, such that sensor 25 and processor 47 are *wirelessly associated.*" Appx0050 at 11:64-66; Appx1273 at 56:11-14 (emphasis added). Based on the description provided, "those skilled in the art should understand that they can make various changes, substitutions and alterations herein without departing from the spirit and scope of the invention in its broadest form." Appx0051 at 13:43-47; Appx1275 at 58:13-17.

As shown by the parallel cites above, **all of the embodiments, descriptions, and figures referenced above appear in both the original '991 application and the '796 patent.**

In addition to the embodiments discussed above, the '796 patent includes Figure 9 and an accompanying description. Appx0050-0051 at 12:49-13:35.



**FIG. 9**

"The exemplary communications device shown [in Fig. 9] is wireless mobile station/remote receiver unit 103 [from Figs. 6–8]. The MS designation has been dropped for convenience." Appx0050 at 12:50-52.

"[R]emote receiver unit 103 comprises radio frequency (RF) transceiver 910 coupled to antenna 905 for receiving a forward channel signal from wireless network base station BS 802 and for sending a reverse channel signal to wireless network base station BS 802 in accordance with well known principles." Appx0050 at 12:53-58.

In this example, main controller 940 is "coupled to" sensor 25, processing circuitry 39 comprising processor 47, and "I/O interface 935, keypad 950 and display unit 955." Appx0050-0051 at 12:59-13:7. The outputs from sensor 25 are "coupled to" processing circuitry 39. Appx0051 at 13:7-9. "In this embodiment of the present invention, the structure of indicating means 41 (not shown in FIG. 9) comprises transmit processing circuitry 915, RF transceiver 910 and antenna 905." Appx0051 at 13:9-13.

## C. In the IPR, Nintendo relied on a single reference, *Yasushi*, and did not offer constructions for "communications device" or "within a communications device."

Nintendo filed a petition for *inter partes* review of claims 1–3, 9–12, and 18–20 of the '796 patent, asserting that the claims were obvious over *Yasushi*, which was published on November 10, 1998. Appx1557. Nintendo contended that *Yasushi* was prior art only under 35 U.S.C. 102(b). Appx1564. Nintendo did not challenge the '796 patent claims on any other grounds. In its petition, Nintendo proposed constructions for thirteen terms, but Nintendo did *not* propose any construction for the terms "communications device" or "within a communications device."

13

**D.   iLife presented evidence antedating *Yasushi* based on prior reduction to practice of embodiments using one-way and distributed communications devices.**

Following the PTAB's institution decision, iLife filed a timely response and argued that *Yasushi* was not prior art to the '796 patent because the inventors had reduced the claimed invention to practice before the publication date of *Yasushi*. iLife proffered uncontroverted evidence showing actual reduction to practice of the invention before November 10, 1998. Appx1769.

iLife's evidence included declarations from expert Dr. Robert H. Sturges (Appx1815), inventor Michael L. Lehrman (Appx1961), inventor Michael D. Halleck (Appx1972), inventor Michael E. Halleck (Appx1991), inventor Alan Owens (Appx2007), inventor Edward L. Massman (Appx2023), and corroborating witnesses Don James (Appx2026) and Greg Younger (Appx2043). iLife submitted substantial corroborating evidence, including contemporaneous records, dated notes, drawings, and descriptions. Appx2059-2119. Nintendo never challenged the veracity of such evidence.

**E.    The    PTAB    determined    the    broadest    reasonable construction of communication device.**

Following iLife's submission of evidence antedating *Yasushi*, Nintendo filed a reply contending that iLife was not entitled to the priority date of the '991 application. Without offering its own construction of "communications device," Nintendo argued that the claims of the '796 patent do not cover devices capable of one-way transmission such as system 11, or distributed devices such as system 11 wirelessly associated with remote receiver unit 103. Appx2128-2129. Because Nintendo's arguments relied on new positions implicating claim construction, iLife objected and the PTAB permitted iLife to submit a sur-reply addressing construction of communications device. Appx2488-2491.

In the Final Written Decision ("FWD"), the PTAB agreed with iLife's claim construction arguments. The PTAB held "that the term 'communication device' includes devices with an RF transmitter and devices with two-way communication." Appx0015. The PTAB found that the original '991 application provides support for "system 11 and remote receiver unit 103 *being a 'communications device.'*" Appx0021.

15

In construing "communications device," the PTAB relied on disclosures and descriptions of the '796 patent that were contained in the original '991 application. *See* Appx0010-0015. For example, because the '991 application "describe[s] an indicating means 41 as being an RF transmitter and operable to *communicate*," the PTAB found that "a device with an RF transmitter would be a *communications* device," and that the term should not be limited to "*two-way* communication devices." Appx0013 (emphasis added). The PTAB also found that the claims must cover "distributed communication devices in which the processor and sensor are wirelessly associated." Appx0018 (citing Appx0058-0059 at 7:28-32, 10:25-50; Appx1261 at 44:15-19; Appx1269 at 52:10-53:8).

## F. The PTAB found that the challenged claims are entitled to the '991 application's priority date of September 15, 1999.

The PTAB made the factual determination that the '991 application's disclosure of system 11 with an RF transmitter "provides adequate written description support for the 'communications device' recited by the challenged claims." Appx0020. The PTAB further found "adequate written description support for system 11 and remote receiver unit 103 being a 'communications device' as recited by the

challenged claims." Appx0021 (citing Appx1890 ¶ 109 ("By operating as a mobile station in a wireless communications system, the distributed device formed by the combination of the sensor system 11 and the remote receiver unit 103 is a communications device")). Additionally, the PTAB found support for a range of "cellular devices, including conventional cellular telephones, PCS handset devices, portable computers, metering devices, transceivers, and the like." Appx0021 (citing Appx1271 at 54:6-10).[1] Thus, the PTAB concluded the '991 application provides adequate written description under 35 U.S.C. § 112 for all the challenged claims. Appx0021-0022.

## G.    The PTAB found actual reduction to practice of the claimed invention before November 10, 1998.

Following evaluation of priority, the PTAB considered the evidence of iLife's reduction to practice. The PTAB found that before November 10, 1998, the inventors built and tested multiple working

---

[1] The '991 application also incorporates books describing conventional computer system architecture; conventional computer, or communications, network design; conventional data communications; and conventional circuit design. Appx0047 at 6:42-61; Appx1262 at 45:6-21. One such book is *The Irwin Handbook of Telecommunications,* by James Harry Green, Irwin Professional Publishing (2nd ed. 1992), which includes a block diagram of a conventional cellular mobile radio receiver. Appx2758.

fall-detection prototypes that were suitable for their intended purpose. Appx0024-0026 (citing Appx1961-1971 ¶¶ 17-21, 26, 30; Appx1972-1990 ¶¶ 15, 18-22, 28-30; Appx1991-2006 ¶¶ 15, 18-22, 28-30; Appx2007-2022 ¶¶ 15, 18-22, 28-30; Appx2026-2042 ¶¶ 18-22, 28-30; Appx2043-2058 ¶¶ 18-22, 28-30; Appx2082-2103).

Based on the substantial, uncontroverted evidence in the record, the PTAB made several factual determinations. The PTAB found that the device "was an intelligent personal emergency response system," which was "capable of evaluating movement of a body relative to an environment," as required by the claims. Appx0026 (quoting Appx0051 at 13:48-49, 14:21-22). The device included a dual-axis accelerometer, which the Board found satisfied a "sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body." Appx0027 (quoting Appx0051 at 13:51-52, 14:23-25). The device also included "a microprocessor with code configured to process the sensed static and dynamic acceleration to determine if the user had experienced a real fall as opposed to normal daily activities," which the PTAB found satisfied the processing limitations. Appx0027-0028 (citing Appx0051 at 13:53-57, 14:26-29).

18

Most importantly for purposes of this appeal, the PTAB found that the device "communicated information indicating whether the evaluated body was within tolerance to a base station for remote monitoring." Appx0028 (citing Appx1968-1971 ¶¶ 23, 30; Appx1983-1990 ¶¶ 24, 34; Appx1999-2003 ¶¶ 24, 30; Appx2069). The communication functionality, the PTAB found, supports the limitations relating to generating and communicating information to a monitoring controller. Appx0028-0029.

Based on these and other findings of fact, the PTAB concluded that the inventors actually reduced to practice embodiments of claims 1–3, 9–12, and 18–20 of the '796 patent by September 1998, before *Yasushi* was published on November 10, 1998. Appx0029-0030.

## H.    The PTAB determined that Nintendo failed to prove invalidity over *Yasushi*.

The PTAB concluded that *Yasushi* was not 102(a) prior art because "[t]he full record indicates that [Nintendo did] not present adequate argument or evidence to challenge the sufficiency of the testimony and evidence submitted by [iLife] that demonstrates an actual reduction to practice prior to November 10, 1998." Appx0030. For these reasons, the PTAB determined that *Yasushi* does not qualify as prior art to the '796 patent and that Nintendo failed to prove "by a

preponderance of the evidence that claims 1–3, 9–12, and 18–20 of the '796 patent are unpatentable." Appx0003; Appx0030.

## III.    <u>SUMMARY OF ARGUMENT</u>

As a threshold matter, Nintendo did not propose constructions for the terms "communications device" and "within a communications device" in its petition and, thus, waived the right to complain about the PTAB's constructions of those terms on appeal. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.*, 672 F.3d 1270, 1278 (Fed. Cir. 2012). In any event, the PTAB correctly determined that the broadest reasonable interpretation of communication device includes both *one-way* communications devices like system 11 using an RF transmitter, and *distributed* communications devices comprising wirelessly-associated components. The PTAB's construction is supported by the claims, which do not require two-way communication and which recite distributed communications devices in dependent claims. It also is consistent with the specification, which describes one-way communication devices and distributed communications devices as exemplary embodiments of the claimed invention. The PTAB correctly rejected Nintendo's belated and unsupported arguments that the

broadest reasonable interpretation of the challenged claims should be limited to particular types of two-way communication devices.

The PTAB's priority analysis also was correct. The PTAB compared each of the properly construed claims to the disclosures of the '991 application, finding written description support for each of the challenged claims. The record includes substantial evidence supporting the PTAB's factual findings and conclusion that the challenged claims are entitled to the priority date of the '991 application. Nintendo relies on *PowerOasis* to argue that the PTAB's analysis under 35 U.S.C. § 120 was flawed. *PowerOasis* does not support Nintendo's positions and is readily distinguishable. The patent owner in *PowerOasis* argued for a broad construction of "customer interface" based entirely on new matter added in a CIP that *broadened* the scope of the invention and patent. 522 F.3d at 1310-11. Here, the PTAB's construction is fully supported by the *original* '991 application, and the '796 patent *narrowed* the claims by reciting that the system is within a communications device.

The PTAB's findings and conclusion regarding prior reduction to practice also are correct and supported by substantial evidence. iLife submitted uncontroverted evidence showing actual reduction to practice

of the claims of the '796 patent before November 10, 1998, thus antedating *Yasushi*.

For these reasons, the PTAB correctly found that Nintendo failed to carry its burden of proving by a preponderance of the evidence that *Yasushi* was prior art. This Court should affirm the PTAB's decision.

## IV.   ARGUMENTS AND AUTHORITIES

### A.   The PTAB correctly rejected Nintendo's narrow construction of the term "communications device."

    1.   *Nintendo waived error regarding the terms "communications device" and "within a communications device."*

Under 35 U.S.C. § 312(a)(3) and 37 C.F.R. § 42.104(b)(3), all IPR petitions must state "[h]ow the challenged claim is to be construed." This Court's review of the PTAB's decision is "confined to the 'four corners' of [the] record," and an appellant is not "permitted to raise arguments on appeal that were not presented to the [PTAB]." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 450 (Fed. Cir. 2015); *see MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 n.3 (Fed. Cir. 2015) ("if a party fails to raise an argument . . . , we may deem that argument waived on appeal."); *Q.I. Press Controls*, B.V. v. Lee, 752 F.3d 1371, 1382 (Fed. Cir. 2014) ("the argument was not presented before the Board and is thus waived.").

22

Nintendo failed to identify and propose constructions for the terms "communications device" and "within a communications device" in its petition or briefing to the PTAB. Appx1558-1559. And, at the oral hearing, Nintendo told the PTAB that it need not define the "outer edges" of the term communication device. Appx2968 at 116:13-24. Nintendo has waived the right to complain on appeal about the PTAB's claim construction of those terms, including whether such construction is incomplete. *Redline*, 811 F.3d at 450. Because Nintendo's priority arguments rest squarely on its claim construction position, those arguments likewise fail, and the Court should affirm the FWD.

2.   *The PTAB correctly construed "communications device" consistent with iLife's proposed construction.*

In an *inter partes* review, "[a] claim in an unexpired patent . . . shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b) (2015); *see Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016). "[C]laims . . . are to be given their broadest reasonable interpretation consistent with the specification, and . . . claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art." *In re Bond*, 910 F.2d 831, 833 (Fed. Cir.

1990) (internal citation and quotation marks omitted). A person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification," which "is the single best guide to the meaning of a disputed term." *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1347 (Fed. Cir. 2016) (internal citations and quotation marks omitted).

A claim term is presumed to have its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). "[W]hen interpreting a claim, words of the claim are generally given their ordinary and accustomed meaning, unless it appears from the specification or the file history that they were used differently by the inventor." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). "Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *Id.*

"Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure so as to give one

24

of ordinary skill in the art notice of the change." *Id.* In the absence of such a definition, limitations are not to be read from the specification into the claims. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1321-23 (Fed. Cir. 2012) (examples in the specification do not limit claims); *Joovy LLC v. Target Corp.*, 437 F. App'x 932, 937 (Fed. Cir. 2011) (importing limitations from the specification to the claims is improper).

3.   *The '796 patent defines "communications device" broadly and without limitation.*

The '796 patent specification states that "[t]he term 'communication device' is defined broadly to include, without limitation, cellular telephones, personal digital assistants, hand held computers, laptops, computers, wireless Internet access devices, and other similar types of communications equipment." Appx0045 at 2:46-50. This passage establishes that the term "communications device" *includes* the listed items, but it does not redefine the term with "reasonable clarity, deliberateness, and precision," so as to *exclude* anything from the ordinary and accustomed meaning of the term "communications device." *See In re Paulsen*, 30 F.3d at 1480. The PTAB correctly found the purported definition is *non-limiting* because it includes the qualifiers "broadly," "without limitation," and "other similar types of

communications equipment." Appx0011-0013 (quoting Appx0045 at 2:46-50). Thus, the definition does not show that the patentee "intended to exclude embodiments already described in the ['991] application." Appx0013.

4. *The broadest reasonable interpretation includes devices with a one-way RF transmitter.*

A proper construction of "communications device" must cover one-way communication devices. The claims of the '796 patent only require the "communications device" to *transmit* tolerance indicia. Appx0051. None of the claims require the communications device to *receive* information. Appx0051.

The specification likewise never states that *two-way* communication is required; to the contrary, it discloses exemplary embodiments using *one-way* RF transmitters to practice the claims. Appx0045-0051. The specification describes "an exemplary embodiment of a system (generally designated 11 [in Figures 1 and 2]) that evaluates body movement *in accordance with the principles of the present invention*." Appx1256-0061 at 39:1-44:1; Appx0047-0048 at 5:15-7:11 (emphasis added). Because system 11 is an "exemplary embodiment . . . of this invention," the claims should cover system 11.

*See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.").

System 11 is "operable to *communicate* [] state, or tolerance, indicia to a monitoring controller" using indicating means 41 (depicted as an RF transmitter). Appx0048 at 7:1-11. This description of system 11 mirrors the elements of dependent claim 9, and shows the patent uses the terms "communicate" and "transmit" synonymously. Moreover, the specification discloses that indicating means 41 "may take any number of forms," and a person of ordinary skill in the art would understand that system 11 may be configured with other conventional communication means, including imbedded digital cellular technology. Appx1260 at 43:14-20; Appx0048 at 7:1-11. Thus, both the language of the claims and the patent's exemplary embodiment support the PTAB finding that the broadest reasonable interpretation of "the term 'communications device' includes devices with an RF transmitter and devices with two-way communication." Appx0015.

Nintendo ignores the claim language and specification support described above, and argues that "communications device" must be limited to devices capable of "voice and data communication," an "original ability to communicate," "two-way" communication, or "bidirectional interpersonal communication." Br. At 13-14, 32, 34. Nintendo's position is incorrect. First, the patent and claims never indicate that communications devices must have such capabilities; instead, the claims merely recite the broad term "communications device," and only require transmission. Second, by attempting to inject such limitations into the claims based on non-limiting examples, Nintendo commits a "cardinal sin" of claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005). Nintendo's position—which would also be incorrect under *Phillip*s in a district court proceeding—fails to apply the broadest reasonable interpretation standard. *See id.* Third, the '796 patent's "definition" of communications device and Figure 9 are described as non-limiting examples. Thus, using them to limit the claims is improper. *See Dealertrack*, 674 F.3d at 1321-23; *Joovy*, 437 F. App'x at 936-37.

5.   *The broadest reasonable interpretation includes distributed devices with wirelessly associated components.*

The claims and specification also dictate that "communications device" must include "distributed devices" with wirelessly associated components. For example, dependent claims 2 and 11 recite that the "communications device" comprises "a cordless telephone." Appx0051.



Appx2749. Nintendo's own expert admits that a cordless phone is a distributed device that typically includes at least "a base station and a wireless handset." Appx2494-2495.

Use of the transition phrase "comprises" in dependent claims 2–3, and 11–12 also supports iLife's position. The term comprises is well-understood to be open-ended such that the claims must include the following elements but may include others. *See Gillette Co. v. Energizer Holdings Inc.*, 405 F.3d 1367, 1371-73 (Fed. Cir. 2005); *Mars Inc. v. H.J.*

*Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004). Thus, while the communications device of claim 2 of the '796 patent must *include* one of a cordless telephone, cellular telephone, and personal digital assistant, the device *may* also include other components, such as a wirelessly associated sensor. Nintendo's narrow construction improperly vitiates the open-ended "comprising" language of claims 2–3 and 11–12.

The specification also describes an "advantageous embodiment" in which "sensor 25 and processor 47 *are not co-located but rather associated wirelessly*," stating that "the principles of *the present invention* may be implemented in any appropriately arranged *device* having processing circuitry." Appx1261 at 44:15-19; Appx0048 at 7:28-32 (emphasis added). The specification identifies Figures 6 and 7 as "a perspective view of an *exemplary* remote receiver unit of the system *of this invention* and a functional block diagram of the same." Appx1269 at 52:10-16; Appx0049 at 10:25-32 (emphasis added). The broadest reasonable interpretation of the claims cannot read out such preferred embodiments. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a construction that reads out a preferred

embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support.").

The exemplary distributed communications device is configured "to *receive alarm transmissions* from sensor 11" and to "initiat[e] a *call* for help or other *remote notification*." Appx1270 at 53:1-15; Appx0049 10:40-58 (emphasis added). Such distributed communications devices may communicate using "an autodialer, *imbedded digital cellular technology*, RF transmitter, or the like." Appx1270 at 53:1-8; Appx0049 at 10:40-50 (emphasis added).

In the example of Figure 8, base stations 801–803 are "operable to *communicate* with a plurality of mobile stations (MS) including MS 103 (remote receiver unit 103)." Appx1270-1271 at 53:21-54:10; Appx0049-0050 at 10:65-11:12 (emphasis added). The '796 patent states that such distributed devices may include "any suitable cellular devices, *including conventional cellular telephones, PCS handset devices, portable computers, metering devices, transceivers, and the like* (including, for instance, remote receiver unit 103)." Appx1270-1271 at 53:21-54:10; Appx0049-0050 at 10:65-11:12. Accordingly, contrary to Nintendo's

31

position, the '796 patent clearly supports distributed communications devices having wirelessly-associated components.

The analysis above also directly refutes Nintendo's argument that the phrase "*within* a communications device" forecloses having the system within *distributed* communications devices. In the example described above, although the sensor and processor are in different components, the claimed system still is "within" the distributed communication device. Nintendo's position also contradicts claims 2 and 11, which recite that the communications device may be a cordless telephone (*i.e.*, a distributed communications device).

Nintendo points to Figure 9, added by the CIP, and claims communications devices must be limited to similar embodiments. Br. at 13-14. In Figure 9, the main controller 940 is "coupled to" sensor 25, processing circuitry 39 comprising processor 47, and "I/O interface 935, keypad 950 and display unit 955." Appx0050-0051 at 12:60-13:7. But even the term "coupled to" may be "construed broadly so as to allow an indirect attachment." *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1271 (Fed. Cir. 2010). Moreover, unlike the written description of Figure 9, the claims recite that the processor and sensor

are "associable with" one another. Appx0051. In its petition, Nintendo

argued the term "associable" must be construed broadly to mean "to

include, be included within, interconnect with, contain, be contained

within, connect to or with, couple to or with, *be communicable with*,

cooperate with, interleave, juxtapose, be proximate to, be bound to or

with, have, have a property of, or the like." Appx1559 (Nintendo's

proposed construction); Appx1252 at 35:10-21; Appx0046 at 4:26-34

(emphasis added). Accordingly, the claims cannot be limited to the

single-component embodiment disclosed in Figure 9. *See Liebel–

Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)

("[T]his court has expressly rejected the contention that if a patent

describes only a single embodiment, the claims of the patent must be

construed as being limited to that embodiment.").

Nintendo cites no law supporting its argument that the Court

should focus solely on embodiments disclosed in the CIP application. To

the contrary, the broadest reasonable interpretation must be based on

the claim language and *all* embodiments described in the specification,

including those that transmit or communicate tolerance indicia without

performing other communication functions. *See In re Bond¸*910 F.2d at 833.

6. *Nintendo's other claim construction arguments lack merit.*

Nintendo makes other claim construction arguments that are factually and legally unsupported. Nintendo asserts that communications device must be construed narrowly because the patentee overcame a statutory double patenting rejection relating to claims 1–24 of US Patent 6,501,386 by amending the claims to add the term "communications device." Br. at 20 (citing Appx1033). The '386 patent is not at issue on this appeal. Moreover, because the original '481 patent claims did not recite a communications device, the amended claims of the '386 patent clearly *are* different than the claims in the '481 patent. Such amendment was adequate to address the statutory-double-patenting rejection. *In re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970) ("By 'same invention' we mean 'identically same inventions.'"). While Nintendo complains that claim 9 of the '796 patent could be commensurate in scope with claim 6 of the '481 patent, that is not relevant to any issue before the Court and has no bearing on the broadest reasonable interpretation of the claims.

Furthermore, Nintendo's incomplete construction of "communications device" is flawed. Nintendo proposes a construction of "'includes at least cellular telephones, personal digital assistants, handheld computers, laptops, computers, wireless Internet access devices and other similar types of communications equipment' that a user would consider to be a "communications device."' Br. at 18-19; *see also* Br. at 17 (citing Appx2592, a slide 67 from Nintendo's demonstratives for oral hearing). But a list of non-exclusive examples is not helpful in construing the term or resolving the disputed issues. Additionally, Nintendo's construction makes little sense when read in the context of claims reciting "[a] system within a [includes at least cellular telephones, etc.]." Nintendo also includes a spurious reference to what "a user would consider to be a 'communications device.'" Br. at 19. This extraneous requirement is not supported by the specification and contradicts law requiring that claim construction be based on the understanding of those skilled in the art. *See Phillips*, 415 F.3d at 1313.

For all these reasons, Nintendo has failed to show reversible error with respect to the PTAB's construction of the challenged claims.

**B.    The PTAB correctly found that the challenged claims are supported by the written description of the '991 application.**

1.    *Priority under section 120 turns on findings of fact that are reviewed for substantial evidence.*

"Entitlement to priority under 35 U.S.C. § 120 is a matter of law which [this court] review[s] *de novo.*" *In re Owens*, 710 F.3d 1362, 1366 (Fed. Cir. 2013). However, the underlying (and here, controlling) issue of "[w]hether a specification complies with the written description requirement of § 112, ¶ 1 is a question of fact that this court reviews for substantial evidence." *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003).

"This is a deferential standard of review." *Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1354 (Fed. Cir. 2015). "Substantial evidence supports a finding that the specification satisfies the written description requirement when the essence of the original disclosure conveys the necessary information—regardless of *how* it conveys such information, and regardless of whether the disclosure's words are open to different interpretations." *Inphi*, 805 F.3d at 1354 (internal citation and quotation marks omitted, emphasis in original). "Precisely how close the original description must come to comply with the description

36

requirement of 35 U.S.C. § 112 must be determined on a case-by-case basis." *Ralston*, 772 F.2d at 1575. "If the evidence in record will support several reasonable but contradictory conclusions, we will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

To be entitled to the filing date of an earlier application, the claims must be supported by adequate written description, under section 112, first paragraph, in an earlier application. 35 U.S.C. § 120 (2012); *In re Owens*, 710 F.3d at 1366. "[T]he test for sufficiency of support in a parent application is whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *In re Owens*, 710 F.3d at 1366; *Ralston*, 772 F.2d at 1575. The written description need not "describe exactly the subject matter claimed." *Wang Labs. v. Toshiba Corp.*, 993 F.2d 858, 865 (Fed. Cir. 1993); *see Martin v. Johnson*, 454 F.2d 746, 751 (C.C.P.A. 1972) ("[T]he description need not be in *ipsis verbis* [i.e., 'in the same words'] to be sufficient"). For example, inventors "are not required to disclose every

species encompassed by their claims." *Application of Angstadt*, 537 F.2d 498, 503 (C.C.P.A. 1976). "A specification may, within the meaning of 35 U.S.C. § 112 ¶ 1, contain a written description of a broadly claimed invention without describing all species that claim encompasses." *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988), *overruled on other grounds by Kubota v. Shibuya*, 999 F.2d 517, 521 (Fed. Cir. 1993).

"A patent specification is directed to one of ordinary skill in the art." *Wang Labs.,* 993 F.2d at 866. The written description requirement, therefore, "must be applied in the context of the particular invention and the state of the knowledge." *Capon v. Eshhar*, 418 F.3d 1349, 1358 (Fed. Cir. 2005). "[T]he Patent Act and this court's case law require only sufficient description to show one of skill in the refining art that the inventor possessed the claimed invention at the time of filing." *Union Oil Co. of Cal. v. Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000). "The primary consideration is *factual* and depends on the nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure." *Union Oil*, 208 F.3d at 996 (internal citation and quotation marks omitted).

Priority is determined on a claim-by-claim basis. *Augustine Medical, Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999). Thus, a "CIP application can be entitled to different priority dates for different claims." *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994); *see PowerOasis*, 522 F.3d at 1306 ("[A] patent application is entitled to the benefit of the filing date of an earlier filed application [] if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.") (internal citation and quotation marks omitted); *Santarus, Inc. v. Par Pharma., Inc.*, 694 F.3d 1344, 1360 (Fed. Cir. 2012) (Newman, J., concurring and dissenting) ("[C]ommon subject matter in a chain of copending applications is entitled to priority from the earliest application disclosing the common subject matter.").

2. *The PTAB correctly analyzed section 120 priority by evaluating whether written description in the '991 application supports the claims of the '796 patent.*

In determining priority, the PTAB properly resolved issues of claim construction first, then made factual determinations regarding the content and disclosure of the '991 application. For the reasons discussed above, the claims of the '796 patent recite that the claimed

39

system be within a device capable of at least transmitting information. The communications device may be a single component or made up of wirelessly associated components. Using such construction, the PTAB properly concluded that the challenged claims are entitled to the benefit of the filing date of the '991 application.

As discussed above, the '991 application discloses embodiments of system 11 with indicating means 41 operable to "communicate [] state, or tolerance, indicia to a monitoring controller." Appx1260 at 43:14-17. Because system 11 communicates using a one-way RF transmitter, the PTAB correctly found it is a communications device under the broadest reasonable interpretation of the claims. Appx0020.

The '991 application also discloses that "[c]ommunication between the processor and the controller may be by a wireless network, a wired network, or, some suitable combination of the same, and may include the Internet." Appx1251 at 34:11-13. For example, system 11 may be configured to include "any suitably arranged computer or other processing system including micro, personal, mini, mainframe or super computers, as well as network combinations of two or more of the same." Appx1261 at 44:12-15. These computer systems are

40

communication devices under broadest reasonable interpretation because they communicate over a network. Nintendo asserts that the disclosures of various computing systems in combination with system 11 are only directed to processing functionality and not to any communication functionality. Br. at 46. However, a computer's ability to communicate is inherent and known, as shown by Nintendo's own admission that a computer includes I/O functionality and is a form of communications device. Appx2128-2129; Appx2413; Appx2458; Appx2604-2605.

The '991 application also discloses additional embodiments in which the sensor 25 and processor 47 are not co-located, but rather associated wirelessly. Appx1261 at 44:15-19. These distributed-device embodiments communicate tolerance indicia using a "retransmission unit 125 (an autodialer, imbedded digital cellular technology, RF transmitter or the like)" to initiate a call or notification. Appx1270 at 53:6-8. The device may be configured to transmit other information, such as a low battery alarm. Appx1270 at 9-15. This distributed device also is a communications device because it receives and transmits

tolerance indicia and other data over a network, such as the public phone system.

The '991 application describes an exemplary distributed device embodiment that communicates over a wireless network using MS 103 (also called remote receiver 103) to receive "transmissions from sensor 25" and communicate with a monitoring controller 805. Appx1269-1275 at 52:16-58:12. The '991 application states that MS/remote receiver unit 103 may be "any suitable cellular devices, including conventional cellular telephones, PCS handset devices, portable computers, metering devices, transceivers, and the like (including, for example, remote receiver unit 103)." Appx1271 at 54:6-10. This discussion of a distributed device that communicates over a wireless network using mobile device 103 (which itself may be a cell phone or computer) provides clear written description support for a system within a communications device. The PTAB's factual finding that the '991 application provides written description support for the challenged claims is supported by substantial evidence. Appx0019-0022. The PTAB's conclusions are entitled to deference and should not be overturned. *Union Oil*, 208 F.3d at 997.

Nintendo argues that the written description in the '991 application is inadequate because it does not support the *full* range of communications devices identified in the purported definition of the '796 patent. Nintendo fails to cite supporting authority for this proposition, and Nintendo is incorrect. The inventors were "not required to disclose every species encompassed by their claims." *Application of Angstadt*, 537 F.2d at 503; *Utter*, 845 F.2d at 998 ("A specification may, within the meaning of 35 U.S.C. § 112 ¶ 1, contain a written description of a broadly claimed invention without describing all species that claim encompasses."); *see also Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012). In any event, as described above, the '991 application discloses broad categories of communication devices encompassing the examples listed in the definition of "communications device," including computers, portable computers, and cellular telephones.

All of the communications devices listed in claims 2–3, and 11–12 of the '796 patent fall within the scope of the disclosure and are commensurate with examples disclosed in the '991 application. *See Application of Risse*, 378 F.2d 948, 953 (C.C.P.A. 1967) *overruled on*

*other grounds by Application of Wertheim*, 541 F.2d 257 (C.C.P.A. 1976). Moreover, such determination is entitled to deference, and the Court "will not find the PTAB's decision unsupported by substantial evidence simply because the PTAB chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d at 1320; *see Union Oil*, 208 F.3d at 997 ("this court will not substitute its judgment for that of the fact finder."). Accordingly, the Court must affirm the PTAB's findings that the '991 application provides adequate written support for the challenged claims and that they are entitled to its filing date.

3. *Nintendo incorrectly analyzes section 120 priority.*

Nintendo repeatedly states that the PTAB erred by failing to determine whether the later issued claims "encompass the new matter" of the CIP application. Br. at 35 ("the scope of all '796 claims is specifically intended to cover the new matter added by CIP"); Br. at 38 (the PTAB failed to address "whether the term encompasses the new matter disclosed" in the '796 patent). Nintendo's analysis turns the section 120 standard on its head. A proper priority analysis focuses on whether the properly construed claims are supported by the original disclosure. In effect, the new material in the CIP is irrelevant to the

analysis. If claims are supported by disclosures in the original application, the claims receive the earlier priority date. *Waldemar*, 32 F.3d at 558; *PowerOasis*, 522 F.3d at 1306; *Santarus*, 694 F.3d at 1360.

Nintendo relies on *PowerOasis,* but it does not support Nintendo's position. The claims in *PowerOasis* recited a vending machine with "a *customer interface* for indicating the status of said vending machine." *PowerOasis,* 522 F.3dat 1302 (emphasis added). The original patent application described a vending machine with a "display" or "user interface" as part of the vending machine, and did not disclose a vending machine with a "customer interface" located remotely on a customer's electronic device. *Id*. at 1307. A CIP application added description of a vending machine with an "interface located remotely from the vending machine, such as on a user's laptop." *Id*.

In construing claims of the CIP patent, the plaintiff argued that the "customer interface" could be on a customer's laptop, while the defendant argued that it must be on the vending machine itself. *Id*. at 1302. The district court adopted the plaintiff's construction and stated that it was relying "entirely on new language" added through the CIP

application. *Id.* at 1302-03. As a result, the court concluded the claims were entitled to the CIP application's priority date. *Id.* at 1309-10.

*PowerOasis* does not change the priority analysis. In *PowerOasis*, both the district court and this Court applied the correct standard set forth in § 120 by comparing the earlier application to the later claims to determine whether the earlier specification provided written description support for the later claims. *Id.* at 1306-10. Indeed, *PowerOasis* acknowledges that later claims are entitled to the benefit an earlier filing "if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112." *Id.* at 1306.

Here, unlike in *PowerOasis*, the PTAB did not rely "entirely on new language" added through a CIP to construe the term "communications device." *See* 522 F.3d at 1302. Instead, in finding the claims cover one-way and distributed devices, the PTAB cited to material in the '991 application. *See, e.g.*, Appx0019-0021. Although the PTAB considered the purported definition in the '796 patent, the PTAB found that such definition did *not* exclude prior disclosed embodiments. Appx0013. By contrast, in *PowerOasis*, the court broadly construed the

claims *only through reference to the new matter added in the CIP application.* 522 F.3d at 1310 ("none of this support was present in the Original Application"). Nintendo contends that "to accept the PTAB's Decision, one must conclude that no new matter was added to the '991 application by the parent CIP," Br. at 27, and that "the '796 claims must encompass [the] new matter [added in the '796 Patent]." Br. at 14. This is contrary to § 120 case law, including *PowerOasis*, holding that CIP applications may be entitled to the benefit an earlier filing. 522 F.3d at 1304 n.3. The PTAB's priority analysis is consistent with *PowerOasis* but correctly reaches a different result.

Nintendo cites *Augustine*, 181 F.3d 1291, to support its argument regarding priority. Br. at 26. But *Augustine* also confirms that different claims of an patent may receive different priority dates. *Id.* at 1302. And, unlike in *Augustine*, the written disclosures in the '796 patent describing use of the system within communications devices, including computers and cellular phones, first appeared in the original '991 application, not the CIP application.

Nintendo also argues that the embodiments of system 11 do not support the claimed communications device because system 11 is not

capable of two-way "interpersonal" communication. But the broadest reasonable interpretation of "communications device" does not require voice communication or data messages. And, even Nintendo's own expert, Dr. Welch, agreed that "the '991 application discloses the acceleration sensor within a device 11 that includes an 'RF transmitter' for communicating with receiver unit 103, as indicated by the PTAB." Appx2412. In addition, the '991 application states that the mobile station/remote receiver unit 103 can be a conventional cellular telephone or portable computer. Appx1261; Appx1271. And the '796 patent incorporated other literature disclosing conventional communications equipment, including cellular transceivers. Appx0048 at 7:49-61; Appx2758. Thus, even if the construction of communications device required two-way capabilities, the '991 application discloses communications devices that support the claims.

Nintendo tries to argue that distributed-device embodiments do not support the claimed communications device. Nintendo makes the heavily qualified and factually incorrect statement that "there is no disclosure of the body monitoring system 11, including both the sensor and the processor, being within a device that also enables the user

48

him/herself to communicate using voice or data messages." Br. at 31. Nintendo's argument is based on the faulty proposition that a communications device must reside within a single housing. As noted, this position contradicts disclosed embodiments and reads out the cordless telephone claimed in dependent claim 2 and 11 of the '796 Patent. Nintendo's own expert admits a cordless telephone is a multi-component device in which the components are not located within the same housing. Appx2494-2495.

Nintendo also mischaracterizes statements made by inventor Ed Massman. Nintendo argues that the "subject matter covered by the '796 claims and reflected in new Fig. 9 (i.e., putting both the sensor and processor in a cell phone) was not even conceived until after the '991 application was filed." Br. at 26. In reality, Massman stated that he was an inventor because he helped to conceive of "additional applications of the inventions, including incorporating the inventions within a cell phone or position locator device. Later patents describe and claim such embodiments . . . ." Appx2024.

Massman did not state that the challenged claims are limited to such embodiments. Nintendo focuses on the word "cell phone" in the

declaration as proof that anything mentioning a cell phone is new matter not entitled to the '991 application's priority date. But, as discussed above, the '991 application expressly discloses using system 11 with various communications devices, including cellular telephones. Appx1271.[2]

Nintendo cites to the iLife's statement during oral hearing that the '991 application did not explicitly describe an embodiment with sensor 25 and processor 47 both co-located within a cell phone housing. Appx3022 at 9-18. Nintendo alleges that "[t]hese critical admissions

---

[2] Nintendo cites *Research Corp. Techs, Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010), for the proposition that a court may consider inventor testimony in the context of a priority analysis. In *Research Corp.*, the Court correctly stated that priority is determined by whether the claims of the later-filed application are supported by the written description in the parent application. *Id.* at 870. While the Court briefly discussed certain inventor testimony, the court never stated that such testimony was determinative of priority. Moreover, unlike here, the inventors in *Research Corp.* admitted during depositions that the original application *did not disclose the subject matter of the broader claims contained in the CIP patent at issue.* Massman did not testify regarding the content of the disclosure of the original '991 application, and testified that the inventors had constructed and built a working prototype of the invention capable of transmission and use of an autodialer before his involvement. Although he participated in discussions about alternative configurations, the '991 application provides written support for systems within communications devices, including distributed devices using cell phones.

preclude any possibility of iLife establishing priority back to the '991 application." Br. at 26. That is false. The independent claims do not recite a cellular telephone, and the "comprising" language of dependent claims 2 and 11 covers distributed-device embodiments such as system 11 paired with mobile station 103 (which itself may be a cellular telephone). Thus, (while the '991 application does not expressly describe placing the entire system within the housing of a cell phone) *none of the claims require placing the entire system inside a cell phone or any other single-housing communications device.*

Nintendo incorrectly argues that iLife's admitted certain dependent claims were only entitled to a later priority date. iLife previously stated that certain dependent claims are entitled to a priority date of *at least* the filing of the CIP application. Appx1627. The PTAB's determination that the '991 application supports an earlier priority date for these dependent claims is a factual determination that, as discussed above, is supported by substantial evidence.

Moreover, there is no support for Nintendo's argument that lack of § 112 support for dependent claims requires a later priority date for the independent claims. While Nintendo is correct that independent claims

necessarily are broader than their dependent claims, it does not follow that a written description providing support for an independent claim must also support its dependent claims. "One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1357 (Fed. Cir. 2007) (citing 35 U.S.C § 112, ¶ 4 (2000) (quoting *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989)). The same logic applies to written description support. A written description may support all the limitations of an independent claim even though it lacks support for limitations of a dependent claim. That is why the effective filing date of a claimed invention is determined on a claim-by-claim basis and not an application-by-application basis. *Santarus*, 694 F.3d at 1352, 1354 (dependent claims received a different effective filing date than their independent claims); *Lucent Technologies, Inc. v. Gateway, Inc.*, 543 F.3d 710, 718 (Fed. Cir. 2008); *Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1270 (Fed. Cir. 2006); *Augustine*, 181 F.3d at 1302; M.P.E.P. § 2152.01 (9th ed. 2015).

Here, the '991 application describes exemplary systems configured to communicate using RF transmitters, embedded digital cellular technology, and the like. The independent claims recite "[a] system is within a communications device," and the dependent claims recite various species of communication devices, such as a cell phone or computer. Based on the written descriptions in the '991 application, the PTAB found that a person of ordinary skill in the art would have understood the inventors to have been in possession of the various species recited in the dependent claims. The PTAB's findings are supported by the written descriptions of the '991 application. Although the written description does not mention each of the claimed species of communication devices recited in the dependent claims *verbatim*, the disclosure still demonstrates possession of the recited communications device and recites a sufficient number of species of communication devices. *Ralston*, 772 F.2d at 1575; *Utter*, 845 F.2d at 998.

Nintendo argues that dependent claims 2, 3, 11 and 12 lack written description support in the '991 application. Br. at 23-25. To satisfy the written description requirement, the '991 application need only recite sufficient detail that one skilled in the art can reasonably

conclude that the inventor had possession of the claimed invention. The PTAB correctly found that the '991 application's broad disclosure of communications devices, including computers, cell phones, and other devices, adequately support these claims. Appx 0019-0021. The PTAB's factual findings regarding support for these dependent claims are entitled to deference. Nintendo cannot show that the PTAB erred in this determination.

Finally, Nintendo incorrectly argues lack of written description support because the entire body evaluation system must be contained "within" each of the listed items. However, the dependent claims use the open-end term "comprising"—meaning that the communication devices may include additional items not mentioned. *Gillette*, 405 F.3d at 1371-73; *Mars*, 377 F.3d at 1377. Thus, the communications device of claim 2 may include a cellular telephone as well as a device such as sensor 25 or system 11 from the '481 specification. Such a multi-component communications device is consistent with the claim language and the '991 application. For all these reasons, the Court should affirm the PTAB's conclusion that the challenged claims are

entitled to the priority date of the '991 application under 35 U.S.C. § 120.

## C. The PTAB correctly found that the evidence shows actual reduction to practice prior to *Yasushi.*

>   1.   *The Court may affirm the PTAB's decision because Nintendo waived arguments concerning the invention date.*

Nintendo never asserted—and, in fact, repeatedly denied—that *Yasushi* was 102(a) prior art. Br. at 1, 3, 9, 14, 24, 26; Appx1564; Appx1564; Appx2124-2125. The PTAB's determination of priority under § 120, therefore, resolves the issue of whether *Yasushi* is prior art. Because *Yasushi* was published on November 10, 1998, less than a year before the date of the '991 application on September 15, 1999, it is not 102(b) prior art. 35 U.S.C. § 102(b). And because Nintendo never argued that *Yasushi* was 102(a) prior art, it has waived that argument on appeal. *Redline*, 811 F.3d at 450; *MCM Portfolio*, 812 F.3d at 1294 n.3; *Q.I. Press Controls*, B.V. v. Lee, 752 F.3d at 1382.

"Any suggestion that a document is prior art because it appears before the filing date of a patent ignores the requirements of section 102(a). Section 102(a) explicitly refers to invention dates, not filing dates. Thus, under section 102(a), a document is prior art only when

published before the invention date." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996).

Nintendo must prove *Yasushi's* status as prior art. *Id.* at 1578. Nintendo never controverted iLife's evidence concerning the invention date. And, on appeal, Nintendo concedes that iLife's evidence shows reduction to practice of at least one embodiment of the '991 application. Br. at 54-55. Thus, Nintendo failed to establish that *Yasushi* is 102(a) prior art, *i.e.*, that it was published before the invention date. And Nintendo waived any error with respect to the PTAB's findings concerning the invention date. *Redline*, 811 F.3d at 450 (Fed. Cir. 2015).

2.    *The PTAB's conclusions of law are reviewed de novo, while its findings of fact are reviewed for substantial evidence.*

"Whether an invention has been reduced to practice is a question of law based on underlying facts. Accordingly, the PTAB's ultimate conclusion of reduction to practice is reviewed *de novo*, while its underlying factual findings are reviewed for substantial evidence." *Henkel Corp. v. Proctor & Gamble Co.*, 560 F.3d 1286, 1288-89 (Fed. Cir. 2009) (citations omitted). "[T]o establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the

56

[claim]; and (2) he determined that the invention would work for its intended purpose." *Id.* at 1289. This Court may not disturb the PTAB's findings so long as there is sufficient evidence that a reasonable person might conclude shows reduction to practice. *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938) (Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

> 3. *An invention date is established by showing reduction to practice of a single working embodiment of the invention.*

A party may antedate a reference by showing earlier reduction to practice. *Price v. Symsek,* 988 F.2d 1187, 1190 (Fed. Cir. 1993); s*ee Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 57 n.2 (1998) ("A machine is reduced to practice when it is assembled, adjusted and used."); *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed. Cir. 1997) ("The standard of proof is a preponderance of the evidence."). The MPEP summarizes what must be shown to swear behind a reference:

> The 37 CFR 1.131(a) affidavit or declaration must establish possession of either the whole invention claimed or something falling within the claim (such as a species of a claimed genus), in the sense that the claim as a whole reads on it . . . . [But] where the differences between the claimed invention and the disclosure of the reference(s) are so small as to render the claims obvious over the reference(s), an

affidavit or declaration under 37 CFR 1.131(a) is required to show no more than the reference shows. . . .

[An] affidavit is not insufficient merely because it does not show the identical disclosure of the reference(s) or the identical subject matter involved in the activity relied upon. If the affidavit contains facts showing a completion of the invention commensurate with the extent of the invention as claimed is shown in the reference or activity, the affidavit or declaration is sufficient, whether or not it is a showing of the identical disclosure of the reference or the identical subject matter involved in the activity.

\* \* \*

A reference or activity applied against generic claims may (in most cases) be antedated as to such claims by an affidavit or declaration under 37 CFR 1.131(a) showing completion of the invention of only a single species, within the genus, prior to the effective date of the reference or activity . . . .

M.P.E.P. § 715.02 (9th ed. 2015) (citing *In re Spiller*, 500 F.2d 1170 (C.C.P.A. 1974); *In re Stryker*, 435 F.2d 1340 (C.C.P.A. 1971)); *see also* M.P.E.P. § 715 (9th ed. 2015) (declarations proper to "swear behind" or "antedate a reference or activity that qualifies as prior art under pre-AIA 35 U.S.C. 102(a) . . . ."); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995) ("While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith.").

A declaration must present "facts showing a completion 'of the invention.' That requirement does not mean affiant must show a

reduction to practice of every embodiment of the invention. Nor is that requirement coextensive with the amount of disclosure necessary to support a claim under 35 U.S.C. § 112." *Application of Hostettler*, 356 F.2d 562, 565 (C.C.P.A. 1966). What matters is the inventive concept:

> Under 35 U.S.C. § 102 an applicant is "entitled to a patent unless" it is shown that one or another of the prohibitory provisions therein, or elsewhere in the statute, applies. In the case of a reference, it is fundamental that it is valid only for what it discloses and if the applicant establishes priority with respect to that disclosure, and there is no statutory bar, it is of no effect at all. . . .

> Rule 131 provides a procedure by which the applicant is permitted to show, if he can, that his date of invention was earlier than the date of the reference. The rule must be construed in accordance with the rights given to inventors by statute and this excludes a construction permitting the further use of a reference as a ground of rejection after all pertinent subject matter in it has been antedated to the satisfaction of the Patent Office.

*Application of Stempel*, 241 F.2d 755, 759–60 (C.C.P.A. 1957); *see also Application of Walsh*, 424 F.2d 1105, 1108 (C.C.P.A. 1970) ("[A] single species reduction to practice is adequate to overcome a reference showing of a genus."); *Stryker*, 435 F.2d at 1342 ("It cannot be the law that the same affidavit is insufficient to remove the same reference applied against the slightly narrower claims presented here."); *Spiller*, 500 F.2d at 1176–77 (prior art is eliminated against "dependent claims .

. . where the differences between the claimed invention and what the reference and affidavits showed were so small as to render the claims obvious to one skilled in the art . . . .") (quotations omitted).

> It is settled, of course, that anticipatory disclosure, not a statutory bar, may be removed as a reference against a generic claim by a Rule 131 affidavit showing prior reduction to practice of as much of the claimed invention as the reference shows. . . .

> When that species of the generic invention which has been completed prior to the effective date of the reference would make obvious to one of ordinary skill in the art the species disclosed in the reference, the reference may be said to have been "indirectly antedated."

> . . . Such a showing is unnecessary when it is otherwise established that the facts set out in the affidavits are such as "would persuade one of ordinary skill in the art to a reasonable certainty that the applicant possessed so much of the invention as to encompass the reference disclosure."

*Application of Schaub*, 537 F.2d 509, 512 (C.C.P.A. 1976) (internal quotations omitted).

4. *The PTAB's findings and conclusions are supported by substantial evidence.*

iLife presented substantial evidence of prior conception and reduction to practice, including testimonial declarations from a technical expert, all five inventors, two corroborating witnesses, and contemporaneous business records corroborating the affidavit

testimony. Appx1815-2119. Based on a thorough review of the evidence of record, the PTAB made detailed findings regarding conception and actual reduction to practice, Appx0022-0030, and concluded that the inventors actually reduced to practice embodiments of claims 1–3, 9–12, and 18–20 of the '796 patent by September 1998, before *Yasushi* was published on November 10, 1998. Appx0029-0030.

Nintendo concedes that the record "evidences a reduction to practice of a dedicated and standalone body evaluation system, including an accelerometer, processor and dedicated RF transmitter" and "a reduction to practice of the basic body evaluation invention of Fig. 2." Br. at 54-55. But Nintendo argues that the inventors did not reduce to practice the challenged claims because such embodiment does not include the sensor, processor, and *two-way* communication means *within a single housing*. Br. at 53-55. According to Nintendo, the claim language "requires a communications device that itself has user communications capabilities, such as voice communication." Br. at 56; *see also* Br. at 57. As discussed above, the PTAB properly found that the broadest reasonable interpretation of "communications device" includes the embodiment of system 11 from Figures 1 and 2, either alone or as

part of a distributed device associated with remote receiver unit 103 from Figures 6 and 7.

Nintendo argues that the record is devoid of any evidence of actual reduction to practice of a system within "a cordless telephone, a cellular telephone and a personal digital assistant," as recited in claims 2 and 11, or a system within "a hand held computer, a laptop computer and a wireless Internet access device," as recited in claims 3 and 12. Br. at 58. However, the evidence clearly shows that the inventors reduced to practice a distributed device including the body-worn system 11 wirelessly associated with a receiver unit and base station dialer to communicate messages via the phone system. Appx0028; Appx2030; Appx2035; Appx2066. Regarding the recited communication functionality of the communications devices in claims 2–3, and 11–12, no meaningful distinction exists between reduction to practice with an autodialer or other conventional communications equipment, such as cell phones or computers. Thus, substantial evidence supports the PTAB's factual determination regarding reduction to practice of the invention. *See, e.g., Schaub*, 537 F.2d at 512; *Spiller*, 500 F.2d at 1176–

77; *Stryker*, 435 F.2d at 1342; *Walsh*, 424 F.2d at 1107; *Stempel*, 241 F.2d at 759–60; M.P.E.P. § 715.02 (9th ed. 2015).

Nintendo also argues that iLife did not show actual reduction to practice of dependent claim 19 reciting the method of clam 10 with the additional step of generating state indicia and transmitting said state indicia through said communications device. Appx0052. Although the device the inventors actually reduced to practice communicated state indicia, including tolerance indicia, Nintendo argues that is insufficient because claim 19 requires "a second transmission that transmits 'state indicia' in addition to the first transmission of claim 10 that transmits tolerance indicia." Br. at 58-59. This argument fails for several reasons. First, Nintendo never construed the term state indicia, thereby waiving its argument that state indicia must include something more than tolerance indicia. Second, the device was programmed to transmit various types of state indicia. Appx1963-1964; Appx1968-1971; Appx1974; Appx1976; Appx1989-1990; Appx2041-2042. For example, the device actually reduced to practice included a push-button alarm and a respiratory monitor, and could also transmit "a record of the positional attitude of the person on a continuous basis" or "a low battery

alarm." Appx2092-0093; Appx2101; Appx2109; Appx2116. Accordingly, the PTAB's findings of reduction to practice are supported by substantial evidence.

Finally, Nintendo argues that iLife failed to reduce to practice claim 20, which recites the method of claim 10, plus the further "steps of: generating in said processor an output signal that is indicative of measurements of both static and dynamic acceleration of said body in plural axes; and transmitting said output signal through said communications device." Br. at 59. iLife's actual reduction to practice used a two-axis accelerometer and transmitted tolerance indicia based on sensed acceleration along both axes. The system was configured to provide "a record of the positional attitude of the person on a continuous basis." Appx2069; Appx2116. Therefore, the PTAB's conclusions have ample factual support.

## D. The Court should reject Nintendo's collateral estoppel arguments.

1. *iLife is not estopped from arguing that the '796 patent claims are patentable over Yasushi.*

Nintendo asserts that "collateral estoppel and waiver preclude any need for remand." Collateral estoppel requires that the issue at stake is *identical* to the one involved in the prior proceeding. *RF Del., Inc. v.*

*Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir. 1985) (collateral estoppel does not apply where reissue claims are not substantially identical to original claims); *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). Nintendo cannot meet that burden because claim 1 differs from the independent claim in IPR2015-00112, and both the independent and dependent claims contain limitations that could not have been raised in IPR2015-00112. Nintendo ignores the "communications device" limitation appearing in each claim of the '796 patent, which has no counterpart in the claims reviewed in IPR2015-00112. Appx0051-0052. Nintendo also ignores limitations of dependent claims 2–3, 9, 11–12, and 18–20, which likewise have no counterparts in the claims reviewed in IPR2015-00112. Appx0051-0052.

Accordingly, if the Court concludes *Yasushi* is prior art, the Court must remand because the PTAB did not reach the issue of whether the challenged claims are obvious over *Yasushi*. A conclusion of obviousness requires preliminary determination of several underlying factual issues. *Interconnect Planning*, 774 F.2d at 1137. Remand is required to afford the PTAB the opportunity to make such factual determinations.

The cases cited by Nintendo do not support its position. *Freeman* addressed the narrow issue of claim construction for the specific phrase "at least a degree of buoyant uplift," previously construed by a district court and then arising again in a reexamination proceeding. 30 F.3d at 1466. Because the two proceedings involved the same patent and the *exact same* claim limitation, the requirements for issue preclusion were met. *Id.* at 1467. The claims of the '331 patent and '796 patent are not identical. In addition, none of the cases cited by Nintendo applied collateral estoppel in the context of obviousness determinations for non-identical claims.

2.    *iLife did not waive or acquiesce to an issue first raised by Nintendo only when iLife had no further right to respond.*

Nintendo claims "[n]othing prevented iLife from raising an argument on 'communications device,'" and that iLife waived arguments based on that limitation. Br. at 64. Nintendo neglects to mention that it first raised the proposed construction urged in this appeal in its reply. *Compare* Appx0062-0064 *and* Appx1557-1559 *with* Appx2123. The PTAB's rules provide no right to patent owners to submit evidence responsive to new issues first raised in a petitioner's reply.

Moreover, iLife's actions are contrary to any claim of waiver. iLife filed a notice regarding the new issue raised by Nintendo for the first time in its reply, submitted supplemental briefing (without being able to file supporting evidence) on the new construction being proposed, objected to the evidence supporting Nintendo's arguments on the new issue, moved to exclude that evidence, and moved for observations. Appx0030-0032; Appx2483-2485; Appx2488-2491; Appx2497-2500; Appx2502-2503. iLife did not waive an argument to which it timely filed objections and motions.

## V.   <u>CONCLUSION</u>

For the reasons discussed above, the Court should affirm the PTAB's findings in all respects, including the PTAB's ultimate conclusion that Nintendo failed to prove by a preponderance of the evidence that claims 1–3, 9–12, and 18–20 of the '796 patent are unpatentable over *Yasushi*.

Dated: December 30, 2016       */s/ Michael C. Wilson*
                                       Michael C. Wilson
                                       Daniel E. Venglarik
                                       S. Wallace Dunwoody
                                       Munck Wilson Mandala, LLP
                                       12770 Coit Road, Suite 600
                                     Dallas, TX 75251
                                     (972) 628-3600

                                     Attorneys for Appellee
                                     iLife Technologies, Inc.

## Certificate of Service and Filing

    I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system on December 30, 2016. All counsel of record were served via CM/ECF on December 30, 2016.

Dated: December 30, 2016       */s/ Michael C. Wilson*
                                         Michael C. Wilson

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

   X   The brief contains <u>12,359</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

      The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

   X   The brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in a <u>14</u> point <u>Century Schoolbook</u> font or

      The brief has been prepared in a monospaced typeface using <u>             </u>in a ___ characters per inch_____ font.


Dated: December 30, 2016          */s/ Michael C. Wilson*
                                     Michael C. Wilson


713735